IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**DONALD GEORGE,**

     **Plaintiff,**

**vs.**                                                          **Case No.  4:13cv429-RH/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act) and an application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History

On May 26, 2010, Plaintiff, Donald George, filed applications for DIB and SSI alleging disability beginning December 29, 2006, based on head injury, nerve damage,

lower back pain, right hip pain, and lower abdominal hernia.  R. 20, 41, 66-67, 149-59, 190.  (Citations to the record shall be by the symbol ("R.") followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for DIB is December 31, 2008.  R. 20, 186, 230.

Plaintiff's application was denied initially on August 4, 2010, and upon reconsideration on October 20, 2010.  R. 20, 68-69, 79-85, 93-97.  On October 25, 2010, Plaintiff requested a hearing.  R. 20, 98.  On December 21, 2011, Administrative Law Judge (ALJ) Stacy Paddock held a hearing in Tallahassee, Florida.  R. 20, 37-65. Plaintiff was represented by Joe G. Durrett, an attorney.  R. 20, 37, 39, 86-89, 108-10, 137-40.  Plaintiff testified during the hearing.  R. 20, 43-55.  Melissa T. Brooks, an impartial vocational expert, testified telephonically during the hearing.  R. 20, 58-63, 141-42 (Resume).  Counsel argued that Plaintiff was unable to engage in even sedentary employment on a full-time basis based on RFC questionnaires submitted by his treating physician, Temple O. Robinson, M.D.  R. 41-42.  The ALJ considered additional evidence submitted by Plaintiff after the hearing, which was mentioned during the hearing.  R. 20, 40-41, 64, 356-64 (Exhibit 15F-Bond Community Health Center (Bond)).

On January 6, 2012, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from December 29, 2006, through the date of her decision.  R. 20-31.  Plaintiff requested review of the ALJ's decision and submitted a two-page brief arguing that the ALJ's decision was flawed because she "accepted the opinions of non-examining physicians over that of [Plaintiff's] treating physician," namely Dr. Robinson, who opined Plaintiff was not capable of sedentary

employment.  R. 4-5, 261-62 (Exhibit 16E).  On June 6, 2013, the Appeals Council

denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the

final decision of the Commissioner.  R. 1-6; *see* 20 C.F.R. § 404.981.

On August 6, 2013, Plaintiff filed a Complaint with the United States District Court

seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law,

docs. 16 and 17, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant has not engaged in substantial gainful activity since December 29, 2006, the alleged onset date."  R. 22.

2.  "The claimant has the following severe impairment: cervical neuroforaminal narrowing and some partial thickness tears and a small enchondroma of his left shoulder causing pain."  *Id.*  The ALJ considered several other impairments such as Plaintiff's left hand pain and numbness, lower back pain, hip pain, status post-hernia, and status post-head injury and determined they were non-severe.  R. 23.  The ALJ considered Plaintiff's "alleged memory deficits" and found that the record did not contain any treatment notes from any treating physician (more than subjective reports).  The ALJ noted that "even if this were to be found a severe impairment, it would only cause the claimant to be restricted to unskilled work" and "there are still unskilled jobs available given claimant's limitations."  *Id.*; *see* R. 30.

3.  "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 23.

4.  "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he should never climb ladders, ropes, or scaffolds and should only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, or reach overhead. Furthermore, the claimant should avoid concentrated exposure to extreme cold, work place hazards, and excessive vibrations."  R. 24.

5.  "The claimant is unable to perform any past relevant work."  R. 29.

6.  "The claimant was born on August 31, 1964 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." *Id.*

7.  "The claimant has a limited education and is able to communicate in English." *Id.*

8.  "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* The representative occupations include a ticket taker, a housekeeping, cleaner, and a mail clerk. These jobs are classified by the DOT as light, unskilled work, at a specific vocational preparation (SVP) of 2.[1]  R. 30. The ALJ considered, in part, the testimony of the vocational expert. R. 61-63.

9.  "The claimant has not been under a disability, as defined in the Social Security Act, from December 29, 2006, through the date of" the ALJ's decision. R. 30.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

---

[1]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). An SVP of 1 means a "[s]hort demonstration only." Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." *Id.*; *see* 20 C.F.R. § 404.1567(b) (definition of light work).

evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3]

----

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[3] The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599,

Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration

unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

[4]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

## IV.  The Evidence

### A.  Plaintiff's Hearing Testimony and Pre-Hearing Reports

Plaintiff is divorced, has no children, and lives with his mother.  R. 43.  Plaintiff

reports his mother pays for his living arrangements along with his sister and brother who

help out paying for medicine and everything he needs.  R. 44.  His mother does the

cooking, cleaning, and household chores.  R. 54-55.  He does not take the trash out or

do yard work.  R. 55.  He stated that "the only thing [he] need[s] to do is just sit there."

*Id.*  They watch television together.  *Id.*

He further testified that he could walk a quarter of a mile, but would stop every

fifteen minutes for a break; he could sit for forty-five minutes to an hour before getting

up; could pour milk; and he could reach in front of him, but it is painful for him to reach

overhead.  R. 50-53; R. 25.  He can gently walk up and down three or four stairs.  R. 52.

It is painful for him to bend over and touch his knees or toes.  *Id.*  Plaintiff testified that he reads the Bible for close to thirty minutes.  R. 54.  Plaintiff can get dressed on his own, and on a good day, he testified that he walked across the street and talked to a neighbor for an hour or so.  R. 54, 56.  He has about five or six bad days in a week. R. 56.  He "stopped drinking a while back" and also stopped smoking cigarettes.  He does not use any street drugs.  R. 56.  He also testified that Dr. Robinson told him he needed a cane and he uses it for balance.  He reported that he watches television for six hours per day.  R. 51, 57, 208; R. 25.

Plaintiff grew up on and worked on a farm.  His father was injured when Plaintiff was seven and Plaintiff went to work on the farm and completed the ninth grade.  R. 44, 288.  He did not complete a GED.  The farm was sold when he was seventeen and he got a different job.  R. 44.

Plaintiff testified that he was hit in the head with a log when he was working for a tree service in 2002.  He did not seek medical treatment right away.  R. 45, 288; R. 24. A few months after that he sustained another injury in his neck while working for a tree service.  He does not allege a disability until 2006.  R. 46.  Plaintiff testified that in 2004 he started a maintenance position at a hotel, but did no "heavy lifting," changed "[l]ight bulbs, housekeeping . . . you know, just covering up holes . . . shampoo."  R. 46, 161, 174.  Plaintiff stated in a work activity report that he was fired in 2007, but did not know why.  R 174 (maintenance work at Motel 6 Operating Ltd Partnership from 2005 to 2007; Hire Quest Trojan Labor-December 2009-no work he could do; no work available); R. 190-91 (work: construction clean up from 1998-1999, December 2009; lumber company making plywood from February 1989 to March 1998; plumbing

company from 2001 to 2003; hotel maintenance from 2004 to 2007).  Plaintiff also

described his jobs (from 1998 to 2006) in more detail in another work history report.

R. 196-202.  As noted, Plaintiff stated that he tried to do some labor work after his

disability onset date.  R. 45, 190-91, 195.[5]

Plaintiff testified that he has pain in his left shoulder and numbness in his hand.

He received injections and he is taking pain medication.  He has headaches all the time,

cannot remember things, and has neck and back pain all the time.  R. 47, 218; R. 24.

He has numbness in his left hand.  His right hand works pretty good.  He was told this

numbness comes from his shoulder and neck problems.  R. 52.  His side effects from

medication include, dizziness, sleepiness, and nausea.  R. 48, 58.  He feels "[r]eal

doped up" when taking his medicine.  R. 58.  He described his back pain in the lower

center with sharp pains.  *Id.*  Hydrocodone makes him "woozy."  R. 58.  The pain affects

his hips also and he has arthritis.  R. 48-49.  He had a hernia when he was 19 or 20

when he was working for the Coastal Lumber Company.  He refused to get it fixed.

R. 49.

### B.  Medical Evidence

In May and June 2010, Plaintiff was treated in the emergency room at Capital

Regional Medical Center in Tallahassee, Florida, for superficial abscesses to the neck

(sebaceous cyst).  R. 242-43, 263-69, 272-78.  At the June 2010 emergency room visit,

the physician noted that Plaintiff could return to work in three days.  R. 243, 264, 273.

---

[5]  Plaintiff noted that he stopped working as a day laborer in December 2009,
because "they ran out of work."  R. 190; *see* R. 174 ("There wasn't any other type of
work that I could do with them.  They didn't have any more work.")  In another work
report, Plaintiff stated that in 2009, he tried to go back to work with day labor "and could
not."  R. 195.  In this same report, Plaintiff stated that in 2007-2008 his condition was
"too bad too much pain couldn't work much."  *Id.*

He was prescribed Vicodin for pain and Bactrim with no refills.  *Id.*  An x-ray of Plaintiff's lumbar spine on July 15, 2010, showed transitional vertebra, but was otherwise negative.  R. 282.  An x-ray of Plaintiff's left hip on that same date was negative. R. 283.

On July 19, 2010, Plaintiff had a consultative evaluation with Wayne Sampson, M.D.  R. 288-93; R. 26.  At this time, Plaintiff complained of neck, left hip, and back pain.  R. 288.  Plaintiff reported that since he was injured in the head by a log in 2002, he had memory problems.  *Id.*  He reported an inguinal hernia, but no past surgical history.  His medications included Tylenol and Hydrocodone.  *Id.*  He was fully oriented, and in no acute distress, he denied chronic fatigue, and his motor strength was 5/5 throughout including his handgrip.  R. 288-89.  Plaintiff reported being last employed in December 2008 as a tree trimmer.  R. 288.  Although Plaintiff walked with a slight limp, he was able to stand and walk on his heel and toes, and was able to get up from a seated position without difficulty.  R. 239, 293.  Plaintiff was also able to get on and off of the examination table without difficulty, and although he had tenderness in his back and left hip, his straight leg raising (SLR) tests were negative on both sides in the sitting and supine positions.  *Id.*  Dr. Sampson assessed that Plaintiff's ranges of motion for his spine, wrists, hands, hips, knees, and ankle were within normal limits.  R. 291-93.  He noted chronic neck, back, and left hip pain, and instructed Plaintiff to follow up with his treating physician for continued healthcare.  R. 290.

On September 13, 2010, Dr. Robinson, with Bond, filled out the first of three RFC questionnaires after one treatment visit with Plaintiff.  R. 223-24, 240-41 (duplicate); *see*

R. 25-26.[6]  Dr. Robinson assessed that Plaintiff could stand and walk a total of two

hours in an eight-hour day; sit a total of two hours in an eight-hour day; lift up to ten

pounds occasionally; could use his hands for repetitive simple grasping, but could not

use his hands for repetitive pushing and pulling or fine manipulation; could occasionally

bend, squat, crawl, and climb; could not reach above shoulder level; could not sustain

activity at a pace and with the attention to task required in the competitive work place;

and could not attend employment for eight hours a day, five days a week.  Plaintiff did

not need a hand-held assistive device for occasional walking or standing. R. 223-24.

Although Dr. Robinson noted that it was the first encounter with Plaintiff, it was noted

that Plaintiff had chronic shoulder and neck pain that had not been evaluated; mild

numbness in the left hand that had not been evaluated; and memory deficits that had

not been evaluated.  R. 224.

During the first visit with Plaintiff on September 13, 2010, and despite the work

preclusive limitations noted above, on physical examination, Dr. Robinson found that

Plaintiff was in no distress; he had full range of motion in his neck, but on deep

palpation, Plaintiff complained of zingers down the left arm and hand.  Plaintiff had full

range of motion of all upper extremities, his motor strength was 5/5 throughout, and his

abduction and adduction, as well as his rotation in the upper and lower extremities were

normal within normal limits.  Plaintiff had some mild hypesthesia of the left hand.

Plaintiff complained of pain on squatting and bending; he also had some difficulty lifting

his left arm above his head.  R. 300, 322 (duplicate).  At this initial visit, Dr. Robinson

noted that Plaintiff reported a "subjective memory deficit" and noted that Plaintiff would

---

[6]  The ALJ considered Dr. Robinson's examination and treatment notes.
R. 25-28.  The ALJ was not persuaded by Dr. Robinson's opinion.  *See infra* at 17-18
for the ALJ's analysis of Dr. Robinson's opinion.

have a mini-mental status evaluation prior to his discharge -- but there was no record of this evaluation.  R. 300.  Plaintiff was prescribed Meloxicam (and treated empirically) for his chronic shoulder pain.  *Id.*  At this time, Dr. Robinson noted that answers to the RFC questionnaire would be provided to the best of his knowledge, but was unsure if he would be able to expound on his answers.  *Id.*; *see* R. 26.

On October 20, 2010, state agency and non-examining physician, Sharmishtha Desai, M.D., reviewed Plaintiff's records and assessed that he could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; and his push/pull was unlimited.  R. 310; *see* R. 28.  Dr. Desai further assessed that Plaintiff could frequently climb ramps/stairs, balance, kneel, and crouch; and occasionally climb ladders/ropes/scaffolds, stoop, and crawl.  R. 311.  Dr. Desai also assessed that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights.  R. 313.  Dr. Desai assessed that Plaintiff's allegations, and the ancillary and objective findings suggested only partial credibility, where the level of the subjective symptoms were disproportionate to the objective findings in the file. R. 314.  The ALJ considered Dr. Desai's opinion that Plaintiff was functionally capable of performing light work, subject to some postural and environmental limitations.  R. 28. The ALJ assigned "some weight" to Dr. Desai's opinion as to the physical limitations of Plaintiff to the extent it was consistent with the ALJ's RFC.  "Factors considered include her status as a licensed medical doctor; the consistency of her opinion with the overall evidence of record; and, the fact that I have been aided at the hearing level by the claimant's testimony and other evidence that was not available for review by state

agency medical expert.  Therefore, I have further the limited the claimant in the above [RFC]."  R. 28.

On October 25, 2010, Plaintiff treated with Dr. Robinson.  Plaintiff complained of continued neck and shoulder pain.  He also complained of recurrent abscesses under the right axilla and right groin.  R. 299, 321 (duplicate); *see* R. 26.  Dr. Robinson reviewed Plaintiff's labs and noted that they were within normal limits.  R. 299. Dr. Robinson noted regarding his hernia that Plaintiff was "cautioned not to lift; however, he worked many years in the logging industry and apparently it caused him no problems at that time."  *Id*.  Dr. Robinson noted that Plaintiff had a decreased range of motion of the neck, but also noted that there were no palpable spasms.  R. 299.  Plaintiff had zingers when Dr. Robinson palpated his neck across the trapezius, more down the left arm than the right.  Plaintiff reported difficulty lifting over his head on the left more than on the right, but his grip strength was 5/5.  *Id*.  Dr. Robinson assessed chronic neck pain and noted that he would try to get a CT of Plaintiff's neck, and would give him a trial of Ultram (narcotic-like pain reliever) and Meloxicam was discontinued.  *Id*.

On January 18, 2011, Plaintiff treated with Dr. Robinson and continued to complain of neck pain, left arm pain, and left hand numbness.  R. 320, 332 (duplicate); R. 26.  Dr. Robinson noted that they would proceed with CT's of his neck and left shoulder.  R. 320.  Dr. Robinson noted that Plaintiff's physical exam was unchanged, but he had a decreased range of motion in the left upper extremity.  *Id*.  He was prescribed Toradol as an anti-inflammatory; Ultram was refilled for pain and he was placed on a trial of Flexeril as necessary for spasm, with two refills.  *Id*.

On March 1, 2011, although Plaintiff again complained of chronic neck and shoulder pain, Dr. Robinson noted that both had an "uncertain cause," but also noted that Plaintiff was getting fair results with Flexeril and Ultram.  R. 331.

On June 8, 2011, Plaintiff treated with Dr. Robinson with continued complaints of low back pain, neck pain, and shoulder pain, and he reported that he had some difficulties in completing his MRI.  R. 330, 363 (duplicate); R. 26.  Plaintiff reported that his shoulder prevents him from getting comfortable in bed; both shoulders hurt, but he cannot sleep at all on his left side; and he continued to have significant low back pain. *Id*.  Dr. Robinson was awaiting results of an MRI.  Plaintiff would continue with a trial of Vicodin, and Flexeril, both with two refills, and Ultram was discontinued.  *Id*.

On June 10, 2011, despite no MRI or other new significant clinical findings, Dr. Robinson completed a second RFC questionnaire regarding Plaintiff.  R. 337-38; R. 26.  Dr. Robinson assessed that Plaintiff could stand and walk for two hours out of an eight-hour day; sit a total of two hours in an eight-hour day; and perform some occasional postural activities.  R. 337.  Dr. Robinson also assessed that Plaintiff could not lift anything.  *Id*.  Dr. Robinson assessed that Plaintiff could not reach above shoulder level; needed a hand held assistive device, although Plaintiff had not obtained a cane; and could not sustain activity at a pace and with the attention required for a competitive work environment.  *Id*.  Dr. Robinson noted that Plaintiff was in the "midst of an orthopedic evaluation" and was due to have an MRI of his neck and left shoulder in the next few weeks.  R. 338.

On June 10, 2011, an MRI without contrast of Plaintiff's left shoulder showed a tiny partial thickness tear of the insertional fibers of the infraspinatus tendon, and a

small enchondroma proximal humerus.  R. 341, 349 (duplicate); R. 26.  An MRI without contrast of Plaintiff's cervical spine on that same date showed canal and foraminal narrowing, with no evidence of cervical cord compression or compression fractures. R. 343.

On July 5, 2011, Plaintiff had a visit with Dr. Robinson to discuss the MRI results, but no physical examination was done.  R. 362; R. 26-27.  Dr. Robinson noted that Plaintiff's left shoulder was not severe and he noted that Plaintiff had some small partial-thickness tears of his supraspinatus tendon and a small enchondroma of the proximal humerous.  His "big concern was the findings of his cervical spine, which revealed significant foraminal narrowing, spurs and disc disease without cord compression but clearly enough disease that could cause chronic pain."  R. 362.  Dr. Robinson recommended that Plaintiff treat with an orthopedist.  He also had him sign a medication contract for long-term Vicodin until he went to an orthopedist.  *Id.*

On August 11, 2011, Plaintiff treated with Gregg A. Alexander, M.D., an orthopedic specialist, based on the referral from Dr. Robinson.  R. 346; R. 27. Dr. Alexander noted that Plaintiff reported an injury from the distant past, and that he was taking Vicodin and Flexeril.  R. 346.  He reviewed Plaintiff's MRI that showed neuroforaminal narrowing, but that the cord was normal in size and signal and the central canal was patent.  *Id.*  He also noted that the MRI of the left shoulder showed a small partial-thickness tear of the infraspinatus tendon only.  *Id.*  Upon examination, Plaintiff's standing posture was normal and his range of motion in his cervical spine was nearly normal.  *Id.*  Plaintiff had no spine deformity; no muscle spasm; and muscles were soft and non-tender.  Reflexes of the upper and lower extremities were

symmetrically diminished.  *Id.*  Dr. Alexander further assessed that he initially thought

that there was weakness in Plaintiff's left hand intrinsics, but that it improved to

essentially normal with repetitive testing.  *Id.*  Although he noted that there was mildly

positive impingement testing of Plaintiff's left shoulder and mild left shoulder pain

associated with rotator cuff strength testing, there was no other deficit in any extremity.

*Id.*  There was no muscle atrophy or fasciculation.  Dr. Alexander further assessed that

Plaintiff's hips, knees, and ankles were normal and his gait, balance, and coordination

were normal.  *Id.*  He noted that Plaintiff had multilevel cervical neuroforaminal

narrowing, including levels C3-4, C4-5, C5-6, and bilaterally C6-7, and although Plaintiff

had radicular complaints, Dr. Alexander stated that were no confirmatory findings of

cervical radiculopathy.  *Id.*  Dr. Alexander thought "[t]here may be peripheral nerve

entrapment at the cubital tunnel."  *Id.*  Dr. Alexander also noted that Plaintiff had chronic

low back pain with no evidence of lumbar radiculopathy and recommended an

EMG/nerve conduction study of the left upper extremity.  *Id.*  The ALJ noted that no

further testing, evaluation, or treatment had been received.  R. 27.

On August 30, 2011, Dr. Robinson completed a third and last RFC questionnaire

regarding Plaintiff.  R. 353-54; R. 27.  Dr. Robinson assessed that Plaintiff would be

able to stand and/or walk for one hour out of an eight-hour day; sit about one hour in an

eight-hour day; could not lift any weight; could not bend or crawl; could not reach above

shoulder level; could not sustain pace and attention for an eight-hour workday; and

could not be expected to attend employment for eight hours a day, five days a week.

R. 354.  Dr. Robinson noted that Plaintiff's condition had declined since his last visit in

July 2011, and that Plaintiff continued on narcotics and anti-inflammatory medications.

*Id.* A patient treatment note from September 19, 2011, states that Plaintiff's physical

exam (general appearance) was unchanged since his previous examination.  R. 360.

Dr. Robinson noted a new problem – diagnosis of cervical radiculopathy with an onset

date of August 30, 2011.  *Id.*

> The ALJ summarized her conclusions regarding the evidence.
>
> Although Dr. Robinson is the claimant's treating physician, his [RFC] assessments are given less than significant weight due to multiple inconsistencies between his capacity assessments and his treatment notes.  In particular, I note the following inconsistencies:
>
> First, at the time of Dr. Robinson's first report in September 2010, Dr. Robinson had only seen the claimant once.  Dr. Robinson's treatment notes indicate that the most significant findings were the claimant's difficulty lifting his left arm above his head and the claimant's subjective report of pain with bending and squatting.  These findings in no way support Dr. Robinson's opinion that the claimant would not be capable of working full-time, nor did they lend any reasoning as to why the claimant would be limited in his ability to stand, walk, or sit for more than 2 hours.
>
> Second, at the time of Dr. Robinson's second report in July [June] 2011, treatment notes only indicate that the claimant had been advised not to lift, and that the claimant had decreased range of motion in his left arm.  No other conditions had changed.
>
> Third, in August 2011, Dr. Robinson for the limited the claimant's ability to sit, stand, or walk to 1 hour per day and noted that the claimant's condition had declined since his last report.  Treatment notes indicate that this was a subjective report of the claimant because Dr. Robinson['s] notes do not indicate any deterioration of the claimant's condition.
>
> Fourth, Dr. Robinson's treatment notes do not mention the claimant's reported "memory deficiencies" or any testing thereof after the claimant's initial reports, suggesting his later impressions did not warrant any further evaluation of the claimant's allegations.
>
> In summary, I do not find evidence in Dr. Robinson's treatment notes that suggest the claimant ever displayed severe limitations that would warrant a limitation to walking and standing for no more than 1 or 2 hours in an 8 hour day.  In addition, I do not find in Dr. Robinson's treatment notes evidence supporting the allegation that the claimant's use of a cane to ambulate is medically necessary.  Moreover, Dr. Robinson's physical capacity assessments contradict the findings of Dr. Sampson or Dr. Alexander, both physically examined the

claimant and found essentially normal findings (Exhibit 9E; Exhibit 5F; Exhibit 7F; Exhibit 9F; Exhibit 10F; Exhibit 11F; Exhibit 12F; Exhibit 13F; Exhibit 14F; and Exhibit 15F).  Accordingly, I assign less than significant weight to Dr. Robinson's physical capacity assessments, and I assign significant weight to the evidence provided by Dr. Alexander, who is an orthopedic specialist and who examined the claimant.  I also assign significant weight to the examination records of Dr. Sampson, who examined the claimant.

As for the opinion evidence, pursuant to 20 CFR 404. 1527 and 416.927 and Social Security Rulings 06-3p, 96-6p and 96-2p, and I have considered the medical opinions of the claimant's treating physicians, evaluating physicians, and state agency medical and psychological consultants.

.
R. 27-28.  The ALJ then considered Dr. Desai's opinion.  R. 28; *see supra* at 12-13. The

ALJ summarized her consideration of her RFC assessment, *see supra* at 3.

In the above [RFC] assessment, I have considered the functional limitations caused - singly and in combination - by every medically determinable impairment identified in this decision.  The [RFC] takes into account not only the claimant's severe impairments, but also his non-severe impairments and also any pain caused by them by limiting him to light work with additional exertional, environmental, and postural limitations.

In making the findings herein, I have considered all the medical records.  Further, I have considered the site effects of the medications as reported by the claimant and as documented throughout the file.

In assessing the claimant's credibility, I note the following issues: his activities of daily living are inconsistent with disabling limitations; he waited several years after quitting his job to seek medical treatment; his impairments are chronic in nature and started while he was still working; and, the claimant has tried to work as a day laborer since filing for disability, but he has been unsuccessful in his work efforts due to a lack of work (Testimony).

In sum, considering the medical signs and findings in the record, the claimant's daily activities and abilities, the claimant's medication and treatment history, all the medical opinions of record, and my assessment of the claimant's credibility, I find that despite his impairments, the claimant retains the ability to perform work within the limitations set forth above.

R. 28-29.

## C.  The Vocational Expert's Testimony

The ALJ asked the vocational expert whether a hypothetical individual of Plaintiff's age, education, and vocational background, who could perform light work except that he should never climb ladders, ropes or scaffolds, and should only occasionally climb ramps or stairs, balance, stoop, crouch, crawl, or reach over head and avoid concentrated exposure to the extreme cold, work place hazards such as moving machinery and unprotected heights, and excessive vibrations, could perform Plaintiff's past relevant work.  R. 61-62.  The vocational expert testified that although such a person could not perform Plaintiff's past relevant work, such a person could perform other jobs that exist in significant numbers in the national economy such as a ticket taker (light, specific vocational preparation (SVP) 2, unskilled); a housekeeping cleaner (light, SVP 2, unskilled); and mail clerk (light, SVP 2, unskilled).  R. 30, 62; *see supra* n. 1.[7]  The vocational expert also opined Plaintiff could perform several jobs at the sedentary level.  R. 62-63.  The ALJ further asked the vocational expert if Plaintiff would need to take an occasional break in order to deal with medication side effects, and the vocational expert testified that an occasional extra break "here and there" was permitted, but daily occurrences would not be permitted.  R. 63.

---

[7]  At step five, the ALJ found that Plaintiff could perform these jobs.  R. 30.  She also found that if Plaintiff "was found to have a severe cognitive problem, it would only cause him to be restricted to unskilled work.  The jobs listed above as a representative sampling are unskilled jobs, which could be performed by an individual limited to simple, routine, and repetitive tasks.  Therefore, I find the claimant is able of performing other work, such as these representative jobs."  *Id.*  These statements were made in the context of the ALJ concluding that Plaintiff's alleged "memory deficits" were not to be a medically determinable impairment.  *Id.*; *see* R. 23 (step two analysis).

## V. Legal Analysis

### A.  Substantial evidence supports the ALJ's determination that Plaintiff's reported memory deficits were not a medically determinable mental impairment.

Plaintiff argues that the ALJ erred in not completing a Psychiatric Review Technique form (PRTF) and performing a special technique analysis for mental impairments pursuant to 20 C.F.R. § 404.1520a due his alleged memory deficits. Doc. 16 at 12-13.  This argument lacks merit because Plaintiff did not present a colorable claim of mental impairment.

In applying the special technique analysis an ALJ must first determine whether a claimant has a "medically determinable mental impairment."  20 C.F.R. § 1520a(b).[8]  If such an impairment exists, an ALJ must then complete a PRTF and append it to the decision or incorporate its mode of analysis into the findings and conclusions.  Moore v. Barnhart, 405 F.3d at 1213–14.  More specifically, an ALJ is required to evaluate "how the claimant's mental impairment impacts four functional areas: 'activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition.'"  Id. at 1213 (citing 20 C.F.R. § 404.1520a(c)(3)-(4)).  In rating the degree of functional limitation in the first three areas, a five-point scale is used (none, mild, moderate, marked, and extreme), and in rating the degree of functional limitation in the fourth area, a four-point scale is used (none, one or two, three, four or more).

---

[8]  Section 404.1508 discusses what is needed to show a medically determinable impairment and states in relevant part that: "Your impairment must result from ... psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A ... mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms ...."  20 C.F.R. § 404.1508.

20 C.F.R. § 1520a(c)(4).[9]  An ALJ's failure to append a PRTF to the decision or

otherwise incorporate its mode of analysis into the findings and conclusions, when a

"colorable claim" of mental impairment has been presented, "requires remand."  Moore

v. Barnhart, 405 F.3d at 1213–14 (citing 20 C.F.R. § 404.1520a(c)(3)-(4)).[10]

     The Eleventh Circuit, however, did not hold that an ALJ's failure to apply the

special technique could *never* be deemed harmless error; rather, the court stated that

under the facts presented it could not evaluate whether the ALJ's error was harmless.

*Id.*  The court specifically stated as follows: "We thus join our sister circuits in holding

that *where a claimant has presented a colorable claim of mental impairment,* the social

security regulations require the ALJ to complete a PRTF and append it to the decision,

or incorporate its mode of analysis into his findings and conclusions.  Failure to do so

requires remand."  *Id.*  (emphasis added).  Thus, remand is required when two factors

are present: (1) a claimant has presented of a "colorable claim" of mental impairment,

and (2) an ALJ has failed to apply the special technique.  *Id.*

     In the instant case, the undersigned concludes that the ALJ committed no error in

failing to apply the special technique because Plaintiff did not present a colorable claim

---

    [9]  A mental impairment is generally found non-severe at step two if the degree of
limitation in the first three functional areas is "none" or "mild" and is "none" in the fourth
area.  20 C.F.R. § 404.1520a(d)(1).  If an impairment is deemed severe at step two, an
ALJ must continue to step three where "marked" functional limitations must generally be
present to satisfy the criteria of a listing.  *See* 20 C.F.R. Part 404, Subpart P, Appendix
1.  Plaintiff does not argue that any of his impairments met or equaled a listing.

    [10]  *See* Dixon v. Astrue, No. 5:09cv320/RS/EMT, 2010 WL 4942141, at *10 n.14
(N.D. Fla. Oct. 26, 2010) and cases cited therein discussing what constitutes a
"colorable claim of mental impairment," *adopted,* 2010 WL 492045 (N.D. Fla. Nov. 30,
2010).

of mental impairment.  In so concluding the undersigned has considered the record as a whole.

Plaintiff correctly notes that Dr. Robinson's treatment notes do not include any "particularized finding concerning [Plaintiff's] memory deficits" notwithstanding his conclusion that Plaintiff "would be unable to sustain attention to task in a competitive work place."  Doc. 16 at 12.  Plaintiff relies on three RFC questionnaires completed by Dr. Robinson, R. 223, 337, 353.  (Plaintiff also relies on his testimony regarding his inability to maintain his most recent full-time employment.)  Doc. 16 at 12-13.  After his first encounter with Plaintiff on September 13, 2010, Dr. Robinson checked "No" to question 9: "Can the claimant sustain activity at a pace and with the attention to task as would be required in the competitive work place?"  R. 223, 240.  In the narrative portion of this questionnaire, Dr. Robinson stated that Plaintiff "has HA3 & memory deficit that has not been evaluated."  R. 224, 241.  On June 8, 2011, Dr. Robinson checked "No" to the same question and offered no further explanation regarding Plaintiff alleged memory deficit.  R. 337-38.  On August 20, 2011, Dr. Robinson again checked "No" to the same question, noting that Plaintiff's condition had declined, but offered no opinion regarding Plaintiff's alleged memory deficits and mental status.  R. 353-54.

Under steps two and five, the ALJ considered Plaintiff's alleged memory deficits and concluded they were not a medically determinable impairment, noting the absence of any treatment notes "(more than subjective reports)" from any physician treating Plaintiff for this allegation.  R. 23; *see* R. 30.  In determining Plaintiff's RFC, the ALJ considered Plaintiff's testimony, including his description of his "activities of daily living in assessing his credibility," and that they "generally reveal functioning at a greater level

than he alleged," R. 25-26.  The ALJ concluded, in part, that "his activities of daily living

are inconsistent with disabling limitations," R. 29, and the medical evidence of record,

R. 25-30.[11]

At step five, the ALJ determined Plaintiff could perform several representative

occupations classified as light, unskilled work.  The ALJ stated in part:

> It is noted that I found the claimant's alleged "memory deficits" not to be a
> medically determinable impairment based on 20 CFR 404.1508 and 416.908;
> however, even if the claimant was found to have a severe cognitive problem, it
> would only cause them to be restricted to unskilled work.  The jobs listed above
> as a representative sampling are unskilled jobs, which could be performed by an
> individual movement to simple, routine, repetitive tasks. Therefore, I find the
> claimant is able [to perform] other work, such as these representative jobs.

R. 30; *supra* n.1.

Substantial evidence supports the conclusion that Plaintiff did not present a

colorable claim of mental impairment.  *See* Moore v. Barnhart, 405 F.3d at 1214.[12]  At

step five, Plaintiff did not rebut the conclusion that he could perform unskilled work even

if he had a colorable mental impairment, R. 30.  Dixon v. Astrue, 2010 WL 4942141, at

*8-10 (finding that even if ALJ erred in not using special technique any such error was

harmless).

---

[11]  The ALJ summarized her conclusions regarding Dr. Robinson's opinions and
noted in part: "Fourth, Dr. Robinson's treatment notes do not mention the claimant's
reported 'memory deficiencies' or any testing thereof after the claimant's initial reports
[*see* R. 224-September 13, 2010, initial patient note], suggesting his later impressions
did not warrant any further evaluation of the claimant's allegations."  R. 28.  Also, the
record does not indicate that Dr. Robinson is a mental health specialist or that Plaintiff
followed-up with a health care provider for further evaluation.  *See* Dixon v. Astrue,
2010 WL 4942141, at *10.  A patient note dated September 19, 2011, from Bond stated
that Plaintiff was "on standby for neurology eval through WeCare Program," presumably
based on an August 30, 2011, patient note from Dr. Robinson stating that Plaintiff had
been seen by an orthopedist and "will now get neurology exam."  R. 354, 359.

[12]  Even if there was error, and there is not, all of the jobs identified by the
vocational expert and adopted by the ALJ as her findings were unskilled jobs.  R. 30.

**B.  Substantial evidence supports the ALJ's consideration of the side effects of medications allegedly suffered by Plaintiff.**

Plaintiff argues that the ALJ did not adequately consider the side effects suffered by Plaintiff as a result of taking medications. Doc. 16 at 13-14.  The ALJ stated that she "considered the side effects of the medications as reported by the claimant and as documented throughout the file."  R. 29.  The ALJ concluded her findings regarding Plaintiff's RFC and stated:

> In sum, considering the medical signs and findings in the record, the claimant's daily activities and abilities, the claimant's *medication* and treatment history, all the medical opinions of record, and my assessment of the claimant's credibility, I find that despite his impairments, the claimant retains the ability to perform work within the limitations set forth above.

R. 29 (emphasis added).

The ALJ questioned Plaintiff regarding any possible side effects from his medications.  R. 48, 58.  In her decision, the ALJ recognized that Plaintiff was taking narcotic medication.  R. 25-26.  The ALJ assessed a limited range of light work that included a limitation to avoid concentrated exposure to work place hazards and excessive vibrations, which accounted for side effects from medication.  R. 24.  Also, the ALJ was not required to include a separate limitation based on, for example, drowsiness, as this limitation was not credibly supported by the record, aside from Plaintiff's testimony.  R. 48, 58.  *See* Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."); Holley v. Chater, 931 F. Supp. 840, 850 (S.D. Fla. 1996) (explaining that when sole evidence of side effects is Plaintiff's testimony, such "scant" evidence is insufficient to support a

finding of disability); *see also* <u>Moorer v. Astrue</u>, No. 3:11cv/LAC/EMT, 2012 WL

3537023, at*11 (N.D. Fla. July 16, 2012) (*quoting* <u>Holley v. Chater</u>), *adopted*, 2012 WL

3536696 (N.D. Fla. Aug. 15. 2012).  No error has been shown.

### C.  Substantial evidence supports the ALJ's evaluation of the weight given to Dr. Robinson's opinions.

Plaintiff argues that the ALJ's finding that Dr. Robinson's opinions were entitled

to less than significant weight was not supported by good cause.  Doc. 16 at 14-16.  As

explained below, substantial evidence supports the ALJ's evaluation of Dr. Robinson's

opinions.

As the finder of fact, the ALJ is charged with the duty to evaluate all of the

medical opinions of the record resolving conflicts that might appear.  20 C.F.R.

§ 404.1527.  When considering medical opinions, the following factors apply for

determining the weight to give to any medical opinion: (1) the frequency of examination

and the length, nature, extent of the treatment relationship; (2) the evidence in support

of the opinion, that is, "[t]he more a medical source presents relevant evidence to

support an opinion, particularly medical signs and laboratory findings, the more weight"

that opinion is given; (3) the opinion's consistency with the record as a whole; (4)

whether the opinion is from a specialist and, if it is, it will be accorded greater weight;

and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  <u>Lewis v.</u>

<u>Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of your medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."  *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."  *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)].  Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source.  Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.  *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The ALJ considered Dr. Robinson's opinions, expressed in the questionnaires, R. 223-24, 337-38, 353-54, and his treatment notes, R. 320-22, 330-31, 362.  R. 25-28. The ALJ outlined several significant reasons for not affording his opinion significant weight.  *Id.*; *see supra* at 17-18.  The ALJ also found that Dr. Robinson's physical capacity assessments were not supported by the findings of Dr. Samson and Dr. Alexander, who both physically examined Plaintiff.  R. 27.  For example, Dr. Samson noted that Plaintiff was able to stand and walk on his heel and toes; was able to get up

from a seated position without difficulty; was also able to get on and off of the examination table without difficulty; and his SLR tests were negative on both sides of the city and supine positions.  R. 289.  Dr. Samson also says that Plaintiff's ranges of motion for his spine, wrists, hands, hips, knees, and ankles within normal limits.  R. 292-93.  Further, Dr. Alexander, who is an orthopedic specialist, noted that Plaintiff's standing posture was normal and his range of motion in the cervical spine was nearly normal.  R. 346.  Dr. Alexander also initially thought there was some weakness in Plaintiff's left hand intrinsics, but that it improved to essentially normal with repetitive testing.  *Id.*  Although he noted that there was mildly positive impingement testing of the left shoulder and mild left shoulder pain associated with rotator cuff strength testing, there was no other deficit in any extremity.  *Id.*  Dr. Alexander further assessed that Plaintiff's hips, knees, and ankles were normal and his gait, balance, and coordination were normal.  *Id.*  Dr. Alexander did not assess any functional limitations.  *Id.*

The ALJ also recognized that state agency non-examining physician Dr. Desai reviewed the available records as of October 2010 and opined that Plaintiff was functionally able to perform light work, subject to postural and environmental limitations. R. 28, 311-14.  The ALJ gave this opinion some weight.  R. 28.  The ALJ further limited Plaintiff after having the benefit of Plaintiff's testimony and later evidence.  *Id.*

Substantial evidence supports the ALJs conclusion that Dr. Robinson's assessments were not supported by the record including his treatment notes and the assessments of Drs. Sampson, Alexander, and Desai.  Plaintiff's argument should be rejected.

### D.  Substantial evidence supports the ALJ's credibility determinations.

Plaintiff argues that the ALJ's credibility analysis of Plaintiff is not supported by substantial evidence.  Doc. 16 at 16-17.  This argument also lacks merit and should be rejected because substantial evidence supports the ALJ's credibility findings.

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson v. Barnhart, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *Id.*

A claimant's description of his impairment and symptoms, standing alone, is insufficient to establish disability.  20 C.F.R. §§ 404.1528(a), 404.1529(a).  Subjective symptoms can be overstated, so a claimant's subjective allegations of pain or other symptoms alone will not establish that he is disabled.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(a).

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test

showing:  (1) evidence of an underlying medical condition; and (2) either
(a) objective medical evidence confirming the severity of the alleged pain;
or (b) that the objectively determined medical condition can reasonably be
expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and

pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).[13]

An ALJ may credit subjective pain testimony even if objective evidence is lacking.

But this is merely permissive guidance.  It does not mandate belief in the subjective

testimony where the substantial evidence in the record indicates otherwise.  After all, in

making the credibility finding, the ALJ is directed to articulate the findings based upon

substantial evidence.  Substantial evidence may consist of objective medical findings, a

lack of other objective medical findings, evidence of exaggeration, inconsistencies in

activities of daily living, failure to pursue recommended physical therapy or to take

prescribed medications, and the like.

The ALJ considered the evidence and found that Plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the Plaintiff's statements concerning the intensity, persistence and

limiting effects of these symptoms were not credible to the extent they were inconsistent

with the RFC of a limited range of light work.  R. 24.  The ALJ noted that Plaintiff's

longitudinal medical history was not consistent with his allegations of disability.  *Id.*  (The

ALJ summarized her findings, R. 29.  *See supra* at 17-18.)

In assessing Plaintiff's credibility, the ALJ appropriately considered Plaintiff's

activities of daily living.  R. 24-25; *see* R. 51-54, 208.[14]  The ALJ also noted that Plaintiff

---

13  Although the ALJ did not expressly refer to the three-part part standard, it is
clear that the ALJ's findings, discussion, and citation to 20 C.F.R. §§ 404.1529 and
416.929, R. 24, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

did not actively seek medical treatment when he was injured in 2002, R. 24, 29, 45, 288, and that Plaintiff's impairments are chronic in nature and started while he was still working.  R. 24.  At step one, the ALJ stated that Plaintiff worked after the alleged disability onset date, but that this work activity did not rise to the level of substantial gainful activity.  R. 22.  The ALJ considered Plaintiff's "ability to work and testimony related to his work as a factor when [she assessed] the credibility of his claims of persistent and intense symptoms that impair[ed] his ability to perform work activity."  *Id.*; R. 29.[15]

Substantial evidence, including the assessments of Drs. Sampson, Alexander, and Desai, supports the ALJ's credibility determinations.  *See* Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").  Plaintiff's argument on this point should be rejected.

---

[14]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

[15]  Plaintiff had tried to work as a day laborer after filing for disability, but reported that he was unsuccessful in his work efforts due to a lack of available work.  R. 24, 29, 190; *see supra* at 8-9 for a discussion of Plaintiff's work history before and after the alleged onset date of December 29, 2006.  As noted herein, the ALJ also considered Plaintiff's reported side effects from his medications.  R. 29.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on March 24, 2014.

<u>**s/ Charles A. Stampelos**</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**